1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   TEMUJIN BUSTOS,                              No.  1:20-cv-00066-DAD-BAM

12              Plaintiff,

13        v.                                      ORDER GRANTING IN PART
                                                  DEFENDANTS' MOTION TO DISMISS,
14   CITY OF FRESNO, *et al.*,                    DENYING DEFENDANTS' MOTION FOR A
                                                  MORE DEFINITE STATEMENT, AND
15              Defendants.                       GRANTING DEFENDANTS' MOTION TO
                                                  STRIKE
16
                                                  (Doc. No. 11)
17

18

19                                  **INTRODUCTION**

20        This matter is before the court on motions to dismiss, for a more definite statement, and to

21   strike filed by defendants the City of Fresno (the "City"); Jerry Dyer, individually and in his

22   former capacity as Chief of the Fresno Police Department ("FPD"); and Andrew Hall,

23   individually and in his current capacity as Chief of FPD (collectively, the "defendants").  (Doc.

24   No. 11.)  The court reviewed the briefing and deemed the matter suitable for decision on the

25   papers pursuant to Local Rule 230(g).  (Doc. No. 14.)  For the reasons discussed below, the court

26   will grant defendants' motion to dismiss in part, deny their motion for a more definite statement,

27   and grant their motion to strike.

28   /////

                                            1

1

**BACKGROUND**

2       Plaintiff Temujin Bustos is currently employed by FPD as a sergeant.  (Doc. No. 1

3  ("Compl.") at ¶ 3.)  According to plaintiff, he was repeatedly passed over for promotion to

4  lieutenant as a result of racial discrimination and in retaliation for engaging in protected speech.

5  (*Id.* at ¶¶ 35–83.)  In his complaint, plaintiff alleges as follows.

6       In or around January 2017, the FPD created a new "corporal" position, intermediate in

7  rank to officers and sergeants.  (*Id.* at ¶ 15.)  According to plaintiff, the program

8
9
10
11
12
13
> was hastily implemented.  Without yet receiving proper training,
> numerous officers were effectively instantaneously transformed into
> corporals.  The new corporals were immediately placed on patrol
> shifts tasked with the supervision of many officers.  For example, a
> corporal with little to no training in that capacity was thrust into
> supervising 40 officers on a patrol shift.  This officer-to-supervisor
> ratio greatly exceeds what is typically considered acceptable for even
> a seasoned sergeant. . . . [T]his situation resulted in a safety hazard
> for officers who were being supervised by untrained staff[] and
> created safety concerns for the public and a general diminution in
> service.

14  (*Id.* at ¶¶ 15, 17.)  Plaintiff raised his concerns about the corporal program to his supervisors at

15  the FPD and to the leadership of the Fresno Police Officer's Association ("FPOA"), the union

16  entity that represents FPD officers, corporals, and sergeants.  (*Id.* at ¶¶ 14, 17, 18.)  These

17  concerns were relayed to FPD management, and then-Chief Dyer and then-Deputy Chief Hall

18  eventually learned that they had originated with plaintiff.  (*Id.* at ¶ 19.)  Chief Dyer thereafter

19  "reluctantly" made changes in the corporals' training program and set limits on their supervisory

20  responsibilities.  (*Id.*)

21       In or around November 2017, plaintiff sat for the exam for promotion to lieutenant and

22  scored highly, ranking third on the promotion list.  (*Id.* at ¶ 20.)  Later that year, Chief Dyer

23  promoted the two individuals who had ranked ahead of plaintiff on the list.  (*Id.*)  In or around

24  September 2018, Dyer interviewed plaintiff along with several other sergeants for promotion to

25  lieutenant.  During that interview, Dyer "expressed frustration" with plaintiff for his

26  communications with the FPOA regarding the corporal program.  (*Id.* at ¶ 21.)  In or around

27  November 2018, Chief Dyer passed plaintiff over and promoted three other sergeants to

28  lieutenant, those ranking fourth, fifth, and sixth on the promotion list.  (*Id.* at ¶ 22.)

1    Plaintiff subsequently met with Dyer to discuss how to increase his chances of being

2    promoted, and Dyer advised him to consult with various deputy chiefs.  (*Id.* at ¶ 23.)  Plaintiff

3    then spoke with four deputy chiefs, five captains, and five to six lieutenants, where he learned that

4    although he had "[n]o serious or specific performance issues," he had apparently upset Chief

5    Dyer by "express[ing] concerns regarding unsafe working conditions and diminished public

6    safety to his union and supervisors."  (*Id.*)

7    In or around March 2019, plaintiff again interviewed with Dyer for an open lieutenant

8    position.  (*Id.* at ¶ 25.)  On April 1, 2019, Dyer informed plaintiff that he would instead promote a

9    sergeant ranked seventh on the promotion list, even though that sergeant had been the subject of

10   recent and serious discipline, unlike plaintiff.  (*Id.*)

11   Plaintiff then lodged an internal complaint about being passed over for promotion.  (*Id.* at

12   ¶ 26.)  In a subsequent meeting in May 2019, plaintiff informed Chief Dyer that he did not want

13   to have a public dispute.  (*Id.*)  Dyer then allegedly made a veiled threat of retaliation against

14   plaintiff.  (*Id.*)  In this regard, Dyer first replied that "he had been sued before by other

15   employees, and some of those employees had expressed regret over suing."  (*Id.*)  He then

16   observed that "people who had sued him in the past had not fared well," and that "he did not want

17   a lawsuit to damage" plaintiff's career, citing plaintiff's "filing of a grievance [as] an example of

18   him being too rigid or stubborn."  (*Id.*)

19   In addition, plaintiff believes that he has been the victim of racial discrimination.  On

20   information and belief, he alleges that "white personnel who have had previous disciplinary

21   issues or who have for some other reason fallen out of favor with the Chief are readily and

22   frequently given second chances[] and [are] generally not delayed in their career advancement."

23   (*Id.* at ¶ 27.)  However, "Hispanic employees" like plaintiff "frequently are relegated to career

24   purgatory for minor and major issues, whether legitimate or illegitimate, real or just perceived."

25   (*Id.*)

26   On August 26, 2019, plaintiff presented a claim for damages (the "tort claim") to the City,

27   alleging claims under 42 U.S.C. § 1983, the California Labor Code, and the California

28   Government Code.  (*Id.* at ¶ 28.)  Plaintiff also complained of disparate treatment on the basis of

3

1    race in violation of the California Fair Employment and Housing Act ("FEHA").  (*Id.*)  On

2    September 3, 2019, four days after the City confirmed receipt of plaintiff's claim, he was

3    removed from the list of candidates for promotion to lieutenant. (*Id.* at ¶ 29.)  After plaintiff

4    grieved this action, he was placed back on the promotion list.  (*Id.*)

5          In October 2019, Chief Dyer retired from the FPD[1] and hand-selected defendant Hall as

6    his replacement, though, according to plaintiff, Dyer continues to "wield[] considerable influence

7    over department decision-making."  (*Id.* at ¶ 31.)  Hall and plaintiff knew each other prior to the

8    former's elevation to Chief of Police.  During a period in which Chief Hall was a captain and

9    plaintiff was a motor sergeant, the former "openly referred" to plaintiff as a "zika baby," referring

10   to a virus that caused an epidemic in the Americas in 2015–16.  (*Id.* at ¶ 32.)  The virus became

11   particularly well-known because it causes birth defects such as microcephaly, a condition where a

12   baby is born with a head much smaller than normal.  (*Id.*)

13         Thereafter, on or around December 5, 2019, Hall and the other defendants again passed

14   over plaintiff and promoted another sergeant who had scored lower on the lieutenant's exam.  (*Id.*

15   at ¶ 33.)  In addition to himself, two other Hispanic officers were also passed over for promotion

16   in favor of lower-scoring white officers. (*Id.*)  On information and belief, plaintiff alleges that

17   defendants refused to promote him because he:  (1) had "exercised his right to petition the

18   government," (2) had "engaged in speech as a private citizen on a matter of public concern," and

19   (3) was discriminated against for being Hispanic.  (*Id.*)

20         Plaintiff then filed this action on January 13, 2020, alleging various causes of action for

21   retaliation in violation of both federal and state law and race discrimination in violation of state

22   law.  (*Id.* at ¶¶ 35–83.)  On March 16, 2020, defendants filed a motion to dismiss several of

23   plaintiff's claims.  (Doc. No. 11.)  Defendants also moved in the alternative for a more definite

24   statement and to strike plaintiff's official capacity claims against Dyer and Hall.  (*Id.*)  Plaintiff

25   /////

26

27   ───────────────
     [1]  Chief Dyer has since been elected the Mayor of Fresno.  *See* Tim Sheehan, *Jerry Dyer Will Be*
28   *Fresno's Next Mayor, He'll Start Work Quickly on Transition Process*, Fʀᴇsɴᴏ Bᴇᴇ (Mar. 11,
     2020), https://www.fresnobee.com/news/local/article241106011.html.

1  filed his opposition to the motion on April 7, 2020, and defendants filed their reply on April 14,

2  2020.  (Doc. Nos. 12, 13.)

3                                    **LEGAL STANDARD**

4         The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of

5  the complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal "can be based on

6  the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable

7  legal theory."  *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (citation

8  omitted).  A plaintiff is required to allege "enough facts to state a claim to relief that is plausible

9  on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial

10 plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

11 inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S.

12 662, 678 (2009).

13        In resolving a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken as true

14 and construed in the light most favorable to the nonmoving party."  *Naruto v. Slater*, 888 F.3d

15 418, 421 (9th Cir. 2018) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.

16 2001)).  However, the court need not accept as true allegations that are "merely conclusory,

17 unwarranted deductions of fact, or unreasonable inferences."  *Sprewell*, 266 F.3d at 988.  Neither

18 must the court "assume the truth of legal conclusions cast in the form of factual allegations."

19 *Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916, 919 (9th Cir. 2008) (citation omitted).

20        While Rule 8(a) does not require detailed factual allegations, "it demands more than an

21 unadorned, the defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A

22 pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the

23 elements of a cause of action."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 676

24 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory

25 statements, do not suffice.").  It is also inappropriate to assume that the plaintiff "can prove facts

26 which it has not alleged or that the defendants have violated the . . . laws in ways that have not

27 been alleged."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459

28 U.S. 519, 526 (1983).

**DISCUSSION**

**A.      Request for Judicial Notice**

Defendants request that the court take judicial notice of the following documents:  (1) a Side Letter of Agreement between the City and the FPOA (the "Side Letter"); (2) an Amended Memorandum of Understanding between the City and the FPOA (the "MOU"); (3) the job description for a FPD police sergeant, as listed on the City's website; and (4) the tort claim presented by plaintiff to the City, dated August 20, 2019.  (*See* Doc. No. 11-2.)

Although courts generally cannot consider material beyond the complaint in ruling on a Rule 12(b)(6) motion, there are two exceptions to this rule:  "the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

Incorporation-by-reference

> is a judicially created doctrine that treats certain documents as though they are part of the complaint itself.  The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims.

*Id.* at 1002.  Even if not directly attached to a complaint, a document may be incorporated by reference "if:  (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion."  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *see also United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (permitting incorporation by reference "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim").  However, a complaint's "mere mention of the existence of a document is insufficient to incorporate the contents of a document."  *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010); *see also Khoja*, 899 F.3d at 1002 ("[I]f the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint.  Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims.").

In addition, a court may take "judicial notice of matters of public record . . . as long as the facts noticed are not subject to reasonable dispute." *Intri-Plex Techs. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) (internal quotation marks omitted). Federal Rule of Evidence 201 specifies that a court can take judicial notice of an adjudicative fact if that fact "is not subject to reasonable dispute" because it either "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." This burden lies with the party requesting judicial notice. *See Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 272 F.R.D. 505, 516 (E.D. Cal. 2011). However, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999. For this reason, courts should not take judicial notice of a fact contained within a document if that fact "is subject to varying interpretations, and there is reasonable dispute as to what [the document] establishes." *Reina-Rodriguez v. United States*, 655 F.3d 1182, 1193 (9th Cir. 2011).

First, as to the Side Letter and the MOU, the court will take judicial notice of the fact that, as embodied by the documents, the City and the FPOA agreed to the creation of the rank of corporal. Both documents are government contracts and are thus matters of public record. *See, e.g.*, *DiRuzza v. Cty. of Tehama*, 206 F.3d 1304, 1311 (9th Cir. 2000) (taking judicial notice of a memorandum of understanding between a government entity and a police officer bargaining unit). In addition, plaintiff does not dispute the authenticity of the documents. However, plaintiff alleges in his complaint that the FPD made changes to the corporal program at some point before November 2017 in response to the concerns he raised. (Compl. at ¶ 19.) As a result, the court cannot ascertain whether the terms contained in the Side Letter (which was signed on November 22, 2016) and the MOU (which, by its terms, applied to the time period between June 26, 2017 to June 23, 2019) actually governed the entire time period placed in question by this action.

Second, as to the sergeant's job description, the court will take judicial notice of the written job description and duties listed therein. The posting is a government document that was made available online by the City and so is a public record. *See, e.g.*, *Lal v. Ogan*, No. 1:18-cv-

00286-LJO-SAB (PC), 2019 WL 427294, at *2 (E.D. Cal. Feb. 4, 2019) (taking judicial notice of "job descriptions and postings provided by [two state agencies]").  In addition, plaintiff does not dispute its authenticity.  However, the court notes that the document is couched in conditional language—for example, it uses "may" five times in a list of eleven "examples of important and essential duties."  (Doc. 11-2 at 113.)  The document also has an effective date of October 8, 2019, which overlaps only with the latter end of the timeline of events alleged by plaintiff in his complaint.  (*Id.* at 115.)  Therefore, the court cannot accept as an adjudicative fact that plaintiff was actually responsible for any of the job duties listed as "examples" in the job description for the time period at issue in this case.

Finally, the court will take judicial notice of the fact that plaintiff (1) filed a tort claim for money damages with the City on August 20, 2019 and (2) alleged retaliation and racial discrimination therein.  (*See* Doc. No. 11-2 at 117–25.)  However, the court cannot take judicial notice of the facts alleged in the tort claim.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (holding that judicial notice is appropriate for "*undisputed* matters of public record" but not for "*disputed* facts stated in public records"); *see also Gong v. City of Rosemead*, 226 Cal. App. 4th 363, 369 n.1 (2014) ("The court may take judicial notice of the filing and contents of a government claim, but not the truth of the claim.").

**B.    Motion to Dismiss**

1.    Plaintiff's First Amendment Retaliation Claim

Defendants first move for dismissal of plaintiff's § 1983 claim, which alleges retaliation in violation of the First Amendment.  "It is well settled that the state may not abuse its position as employer to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.'"  *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (alteration in original) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  This is so in part because the public often "has a strong interest in hearing from public employees, especially because '[g]overnment employees are often in the best position to know what ails the agencies for which they work.'"  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1066 (9th Cir. 2013) (en banc) (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994)).

However, "[o]ut of recognition for 'the State's interest as an employer in regulating the speech of its employees," courts must "arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1068 (9th Cir. 2012) (quoting *Connick v. Myers*, 461 U.S. 138, 140 (1983) and *Pickering*, 391 U.S. at 568). Otherwise, "government offices could not function if every employment decision became a constitutional matter." *Connick*, 461 U.S. at 143.

The Ninth Circuit has therefore arrived at the following sequential five-step test from *Eng*:

> First, the plaintiff bears the burden of showing: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; and (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action. Next, if the plaintiff has satisfied the first three steps, the burden shifts to the government to show: (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013) (citing *Eng*, 552 F.3d at 1070). Because "all five factors are independently necessary," *Dahlia*, 735 F.3d at 1067 n.4, "a reviewing court is free to address a potentially dispositive factor first rather than addressing each factor sequentially." *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1260 (9th Cir. 2016).

          a.     *Plaintiff's Communications with His Union: Speaking as a Private Citizen or Public Employee?*

Defendants argue that plaintiff cannot maintain his First Amendment claim because "[d]espite Plaintiff's conclusory allegation that he complained about safety issues involving the rank of Corporal in his individual capacity, the specific allegations make clear that such statements were made in his official capacity as Sergeant of the Fresno Police Department." (Doc. No. 11-1 at 12.) In light of defendants' arguments, (*see* Doc. No. 11-1 at 14–20), the court will focus on the second *Eng* factor: whether plaintiff spoke as a private citizen or as a public

/////

9

1 employee when he raised concerns about the corporal program to his supervisors and the

2 leadership of his union.

3        It is a given that "public employees do not surrender all their First Amendment rights by

4 reason of their employment" and retain the right, "in certain circumstances, to speak as a citizen

5 addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *see also*

6 *Kennedy v. Bremerton Sch. Dist.*, 869 F.3d 813, 822 (9th Cir. 2017).  The "mere fact that a

7 citizen's speech concerns information acquired by virtue of his public employment does not

8 transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S.

9 228, 240 (2014).  Rather, "speech by public employees on subject matter related to their

10 employment holds special value precisely because those employees gain knowledge of matters of

11 public concern through their employment." *Id.*  However, the law is also clear that the "First

12 Amendment does not protect speech by public employees that is made pursuant to their

13 employment responsibilities—no matter how much a matter of public concern it might be."

14 *Coomes*, 816 F.3d at 1260 (citing *Garcetti* 547 U.S. at 423–24).  Thus, the "critical question

15 under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's

16 duties, not whether it merely concerns those duties." *Id.* (citing *Lane*, 573 U.S. at 240).

17        Determining "whether the speech in question was spoken as a public employee or a

18 private citizen presents a mixed question of fact and law." *Kennedy*, 869 F.3d at 823 (quoting

19 *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008)).  "First, a

20 factual determination must be made as to the scope and content of a plaintiff's job

21 responsibilities." *Id.* (quoting *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir.

22 2011)).  This inquiry is fact-intensive and defies "easy heuristics." *Dahlia*, 735 F.3d at 1069.

23 Rather, "[t]he proper inquiry is a practical one," *Garcetti*, 547 U.S. at 424, that is "not limited to a

24 formalistic review of [the plaintiff's] job description." *Coomes*, 816 F.3d at 1260.  "Second, the

25 ultimate constitutional significance of those facts must be determined as a matter of law."

26 *Kennedy*, 869 F.3d at 823 (quoting *Johnson*, 658 F.3d at 966).

27        As a preliminary matter, plaintiff does not contest that the complaints he made to his

28 supervisors at the FPD about the corporal program are not protected by the First Amendment.

1    (*See* Doc. Nos. 11-1 at 16–17; 12 at 13–30.)  Thus, to the extent that plaintiff's § 1983 claim is

2    predicated on such conduct, it will be dismissed as legally not cognizable.[2]  *See Dahlia*, 735 F.3d

3    at 1074 ("[G]enerally, 'when a public employee raises complaints or concerns up the chain of

4    command at his workplace about his duties, that speech is undertaken in the course of performing

5    his job.'").  Thus, the court will only analyze plaintiff's claim that "his speech to his union was

6    undertaken as a private citizen, not pursuant to his official duties as a public employee."  (Doc.

7    No. 12 at 20.)

8          Recognizing that "no single formulation of factors can encompass the full set of inquiries

9    relevant to determining the scope of a plaintiff's job duties," the court in *Dahlia* identified several

10   "guiding principles" and "factors to consider."  *See Dahlia*, 735 F.3d at 1074 & n.13.

11         "First, particularly in a highly hierarchical employment setting such as law enforcement,

12   whether or not the employee confined his communications to his chain of command is a relevant,

13   if not necessarily dispositive, factor in determining whether he spoke pursuant to his official

14   duties."  *Dahlia*, 735 F.3d at 1074; *see also Cochran v. City of Los Angeles*, 222 F.3d 1195, 1201

15   (9th Cir. 2000) (holding that "a wide degree of deference" is due to police departments in part

16   because "[d]iscipline and esprit de corps are vital to [their] functioning").  "If, however, a public

17   employee takes his job concerns to persons outside the workplace in addition to raising them up

18   the chain of command at his workplace, then those external communications are ordinarily not

19   made as an employee, but as a citizen."  *Id.* (quoting *Davis v. McKinney*, 518 F.3d 304, 313 (5th

20   Cir. 2008)); *see also Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006) (holding that a

21   correctional officer's communications to a state senator and to the state inspector general's office,

22   both outside of her chain of command, were "protected under the First Amendment").

23         Here, plaintiff raised his concerns about the corporal program to both his supervisors at

24   the FPD *and* to the leadership at the FPOA.  The "external communications" made to the FPOA

25   thus fit squarely into the framework set out in *Dahlia* for speech made as a private citizen,

26

27   [2]  Alternatively, the court can also dismiss this claim because plaintiff failed to oppose
     defendants' motion to dismiss it.  *See Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1205 (N.D. Cal.
28   2014) (failure to oppose a motion to dismiss constitutes abandonment of a claim) (collecting
     cases).

1    plaintiff's communications to his supervisors at the FPD notwithstanding.  *See Dahlia*, 735 F.3d

2    at 1074.  In addition, the Ninth Circuit has clearly affirmed that reports to police unions can

3    constitute protected speech, depending on the facts of the case.[3]  *See Dahlia*, 735 F.3d at 1077

4    ("[W]e conclude that Dahlia's report to his police union constituted protected speech."); *Ellins*,

5    710 F.3d at 1059–60 ("[A] jury could reasonably conclude that Ellins's [police] union activities

6    and related speech were undertaken in his capacity as a private citizen."); *cf. Manhattan Beach*

7    *Police Officers Ass'n, Inc. v. City of Manhattan Beach*, 881 F.2d 816, 819 (9th Cir. 1989)

8    (suggesting that "denials of confidential, supervisory posts based on union activities do not

9    necessarily violate [F]irst [A]mendment rights").  Thus, at this juncture, the court cannot find as a

10   matter of law that plaintiff spoke as a public employee when he communicated with the FPOA.

11   Though defendants attempt to distinguish *Dahlia* and *Ellins* on the facts, (*see* Doc. No. 13 at 4–

12   6), plaintiff has plainly alleged a plausible claim that he spoke as a private citizen outside of the

13   scope of his job duties.  To the extent that there is a dispute as to the exact scope of plaintiff's job

14   responsibilities and the nature of his communications to the FPOA, "the court must reserve

15   judgment . . . until after the fact-finding process."  *Posey*, 546 F.3d at 1131; *see also Dahlia*, 735

16   F.3d at 1072

17          Accordingly, the court will deny defendants' motion to dismiss as to the part of plaintiff's

18   § 1983 claim that is based on his communications with his union without prejudice to that issue

19   being raised again by way of motion for summary judgment.

20                 b.     *Plaintiff's Government Tort Claim:  A Matter of Public Concern?*

21          Defendants also seek to dismiss plaintiffs' § 1983 claim insofar as it is based on plaintiff's

22   filing of a government tort claim on August 26, 2019, which plaintiff alleges led to further

23   retaliation against him.  (Doc No. 11-1 at 19.)  According to defendants, a government tort claim

24   "is not a matter of public concern, but a complaint to remedy a personal situation."  (*Id.*)

25   _____

26   [3]  Defendants' heavy reliance on out-of-circuit authority, (*see* Doc. No. 11-1 at 14–20), is
     unavailing where, as here, the Ninth Circuit has spoken on the issue.  *See Entler v. Gregoire*, 872
     F.3d 1031, 1042 (9th Cir. 2017) ("[I]n the face of Ninth Circuit precedent, we need not resort to

27   out-of-circuit caselaw . . . ."); *Farrakhan v. Gregoire*, 590 F.3d 989, 1000 (9th Cir. 2010), *aff'd*

28   *on reh'g en banc*, 623 F.3d 990 (9th Cir. 2010) ("Out-of-circuit cases are not binding on this
     Court and therefore do not constitute 'controlling authority.'").

                                                      12

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Moonin v. Tice*, 868 F.3d 853, 863 (9th Cir. 2017) (quoting *Lane*, 573 U.S. at 241); *see also Ulrich v. City & County of San Francisco*, 308 F.3d 968, 978 (9th Cir. 2002) (defining public interest "broadly"); *Roe v. City & County of San Francisco*, 109 F.3d 578, 586 (9th Cir. 1997) (noting the Ninth Circuit's "liberal construction of what an issue 'of public concern' is under the First Amendment"). On the other hand, "[s]peech that deals with 'individual personnel disputes and grievances' that 'would be of no relevance to the public's evaluation of the performance of governmental agencies generally is not of public concern." *Ellins*, 710 F.3d at 1057 (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)).

Determining whether a public employee's speech "addresses a matter of public concern is a pure question of law that must be determined 'by the content, form, and context of a given statement.'" *Karl*, 678 F.3d at 1069 (quoting *Connick*, 461 U.S. at 147–48 & n.7). Of these three factors, the content of the speech is "the greatest single factor." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009) (quoting *Johnson v. Multnomah County*, 48 F.3d 420, 424 (9th Cir. 1995)).

Here, plaintiff submitted a government tort claim to the City on August 26, 2019, alleging "violations of 42 U.S.C. § 1983, the California Labor Code, and the California Government Code," as well as "disparate treatment on the basis of race," in violation of FEHA. (Compl. at ¶ 28.) For the following reasons, the court finds that plaintiff's tort claim speaks to a matter of public concern.

i.   The Content of Plaintiff's Speech

First, the content of the speech. It is true, as defendants argue, that the tort claim "deals with individual personnel disputes and grievances." *McKinley*, 705 F.2d at 1114. However, the fact that plaintiff's speech is about a personnel issue does not automatically end the inquiry into whether it is protected under the First Amendment. As the court in *McKinley* elaborated upon, individual personnel grievances are not a matter of "public concern" *if* they involve "information

13

1    [that] would be of no relevance to the public's evaluation of the performance of governmental

2    agencies." *McKinley*, 705 F.2d at 1114.

3          Here, there are two layers to plaintiff's tort claim:  (1) the *prima facie* layer, which grieves

4    individual personnel actions allegedly taken against him by FPD as a result of both alleged

5    retaliation and racial discrimination, and (2) an underlying layer that consists of the concerns

6    plaintiff had raised about the corporal program and which allegedly led to the aforementioned

7    retaliation.  (*See* Doc. No. 11-2 at 117–25.)

8          As a preliminary matter, the fact that plaintiff grieved *his own* personnel issues does not

9    categorically render his speech a private matter.  To be sure, the Ninth Circuit has set a high bar

10   for an individual grieving his own employment issues to show that such speech is a matter of

11   public concern.  *See Ellins*, 710 F.3d at 1057 (explaining that "[t]he dispositive fact in *Connick*"

12   was that the plaintiff's speech originated from "an *individual* personnel grievance"); *Thomas v.*

13   *City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004) (noting that the type of personnel matters

14   that the Ninth Circuit had previously "deemed unprotected under the public concern test are

15   employment grievances in which the employee is complaining about her *own* job treatment, not

16   personnel matters pertaining to others").  But to read those cases as an *absolute* bar to a First

17   Amendment retaliation claim would be contrary to Supreme Court precedent.  *See Connick*, 461

18   U.S. at 147 (recognizing that a public employee's speech on "matters only of personal interest"

19   may nevertheless be protected speech in "unusual circumstances"); *see also Roe*, 109 F.3d at 585

20   (same).  Moreover, such a conclusion would also run up against at least two other important free

21   speech considerations.

22         First, deeming plaintiff's tort claim a private matter simply because it grieved adverse

23   employment actions taken against him without considering "the whole record," *Connick*, 461

24   U.S. at 148, would be overly mechanistic and inconsistent with the Ninth Circuit's commands

25   that matters of public concern be defined "broadly," *Ulrich*, 308 F.3d at 978, and be given a

26   "liberal construction," *Roe*, 109 F.3d at 586.  *See also Clairmont v. Sound Mental Health*, 632

27   F.3d 1091, 1103 (9th Cir. 2011) (emphasizing that the Ninth Circuit has "rejected 'rigid multi-

28   part tests' and refused to 'articulate a precise definition of public concern'" because it favors a

                                                    14

1   "generalized analysis of the nature of the speech") (quoting *Desrochers*, 572 F.3d at 709).

2   Second, the practical consequences of an absolute bar would be anathema to the First

3   Amendment's protections.  Imagine, for example, a public employer who retaliates against an

4   employee for speech protected by the First Amendment.  When the employer is subsequently and

5   publicly accused by its employee of unlawful retaliation for protected speech, the employer could

6   simply retaliate again and claim that its second act of retaliation was in response to the

7   employee's protest against the first act of retaliation.  Thus, an absolute bar to a plaintiff bringing

8   claims on behalf of himself would allow an employer to do what it could not lawfully do under

9   the First Amendment—albeit via a more circuitous route.  Such an outcome would be antithetical

10  to free speech jurisprudence.

11         Of course, First Amendment retaliation claims based on an individual's own personnel

12  matters should be disfavored, else "every employment decision bec[o]me[s] a constitutional

13  matter."  *Connick*, 461 U.S. 138, 143.  But that does not mean that plaintiff's claim is foreclosed

14  *solely* because it arises from his own employment grievance.  *See Connick*, 461 U.S. at 147; *see*

15  *also Pickering*, 391 U.S. at 569 ("Because of the enormous variety of fact situations in which

16  critical statements by . . . public employees may be thought by their superiors . . . to furnish

17  grounds for dismissal, we do not deem it either appropriate or feasible to lay down a general

18  standard against which all such statements may be judged.").

19         The court now turns to the substance of the allegations contained in plaintiff's tort claim.

20  Although the grievances about retaliation alleged therein can be characterized as an "individual

21  personnel dispute," *McKinley*, 705 F.2d at 1114, they can also be traced directly to the concerns

22  that plaintiff had raised about the corporal program, including whether the sudden promotion of

23  rank-and-file officers to supervisory positions would pose a "safety hazard" for police officers

24  and whether it would "create safety concerns for the public and a general diminution in service."

25  (Compl. at ¶¶ 15, 17; *see also* Doc. No. 11-2 at 121–24.)  Indeed, the tort claim itself contains a

26  description of plaintiff's concerns that he had allegedly raised about the corporal program.  (*See*

27  Doc. No. 11-2 at 121.)  Plaintiff's tort claim therefore implicates the performance of FPD, a

28  matter clearly of public concern.  *See Moonin*, 868 F.3d at 864 ("As a matter of law, the

15

competency of the police force is surely a matter of great public concern.”) (quoting *Robinson v. York*, 566 F.3d 817, 822 (9th Cir. 2009)); *see also McKinley*, 705 F.2d at 1114 (same); *Eng*, 552 F.3d at 1073 (“Speech that is ‘relevan[t] to the public’s evaluation of the performance of governmental agencies’ also addresses matters of public concern.”) (quoting *Freitag*, 468 F.3d at 545).

Moreover, there is some support in the case law for the proposition that the issues underlying an instance of speech may be sufficiently important as to warrant protection under the First Amendment.  For example, in *Alpha Energy Savers, Inc. v. Hansen*, the Ninth Circuit held that speech can be protected so long as (1) the speech itself directly addresses a matter of public concern—even if offered in a setting “that involves only purely private grievances or issues” or (2) the “underlying” issue implicates a matter of public concern—“even if the speech itself would not otherwise meet the *Connick* test were . . . [it] considered . . . in isolation.”  381 F.3d 917, 927 (9th Cir. 2004).  Though the holding in *Alpha Energy Savers* came in the context of an individual testifying in judicial and administrative proceedings on behalf of another individual who was allegedly the target of race and age discrimination, the broader principle is that speech, in some cases, may merit protection because of the public importance of an underlying issue.  *See id.* (“Either one, the testimony or the proceeding, by itself, may be sufficient. . . . So long as either the public employee’s testimony or the underlying lawsuit meets the public concern test, the employee may, in accord with *Connick*, be afforded constitutional protection against any retaliation that results.”)

The content of plaintiff’s tort claim here touches on matters of public concern for two other reasons.  First, plaintiff alleges a pattern of racial discrimination against Hispanic employees, including himself.[4]  (*See* Doc. No. 11-2 at 123.)  “Reports pertaining to others, even if they concern personnel matters including discriminatory conduct, can still be ‘protected under the

---

[4]  Plaintiff’s claim of racial discrimination appears to be inextricably linked to his concurrent claims of retaliation because he alleges that Hispanic employees suffer harsher consequences when they are punished, regardless if it is for “legitimate or illegitimate” reasons.  (Doc. No. 11-2 at 123.)  Thus, implicit in plaintiff’s tort claim is the possibility that any retaliation that he suffered may have been amplified by racial discrimination.

public concern test.'" *Robinson*, 566 F.3d at 823; *see also Alpha Energy Savers*, 381 F.3d at 926–27 (holding that "invidious discrimination" is inherently a matter of public concern "whether it consists of a single act or a pattern of conduct"). Second, "the way in which an elected official or his appointed surrogates deal with diverse and sometimes opposing viewpoints from within government is an important attribute of public service about which the members of society are entitled to know." *McKinley*, 705 F.2d at 1115. How defendants Dyer and Hall[5] responded to plaintiff's speech therefore involves a matter of public concern.

Weighing all of these factors together, the court concludes that the content of plaintiff's tort claim is clearly a matter of public concern.

### ii.     The Form of Plaintiff's Speech

As to form, plaintiff "spoke" via a written tort claim submitted to the City.[6] Claims submitted under the California Tort Claims Act are considered public records under the Public Records Act and are therefore subject to disclosure to the public. *See Poway Unified Sch. Dist. v. Superior Court (Copley Press)*, 62 Cal. App. 4th 1496, 1501 (1998). However, the public impact of plaintiff's speech is somewhat mitigated by the fact that he did not act to publicly disseminate his claim, leaving it with a relatively limited audience. *Compare Ellins*, 710 F.3d at 1058 (public speeches support a finding of public concern), *with Desrochers*, 572 F.3d at 714–15 ("Because the speech at issue took the form of internal employee grievances which were not disseminated to the public, this portion of the *Connick* test cuts against a finding of public concern."); *cf. McKinley*, 705 F.2d at 1115 ("[P]laintiff's speech was specifically and purposefully directed to the public both through city council meetings and a television interview."); *see also Roe*, 109

---

[5] Both were appointed as Chief of FPD by the Mayor of Fresno. *See* Brianna Calix & Bryan-Jon Anteola, *Andy Hall to Replace Jerry Dyer as Fresno Police Chief*, Fresno Bee (Aug. 22, 2019), https://www.fresnobee.com/news/local/article234295797.html; *Jerry Dyer Biography*, Fresno Police Officers' Association (Nov. 2019), https://fresnopoa.org/wp-content/uploads/2019/11/Jerry-Dyer-Biography.pdf.

[6] To the extent that plaintiff is also proceeding under the First Amendment's Petition Clause, the analysis is similar because "[p]etitions are a form of expression, and employees who invoke the Petition Clause in most cases could invoke as well the Speech Clause of the First Amendment." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 382 (2011) ("[T]he right to speak and the right to petition are 'cognate rights.'").

1   F.3d at 585 (noting that a "limited audience weigh[s] against [a] claim of protected speech").

2   However, whether plaintiff spoke publicly or privately is not dispositive. *See Thomas*, 379 F.3d

3   at 808; *see also Garcetti*, 547 U.S. at 420; *Anthoine v. N. Cent. Ctys. Consortium*, 605 F.3d 740,

4   749 (9th Cir. 2010). It is enough that plaintiff sought to raise his concerns to an entity with the

5   power "to address and correct the problem." *Anthoine*, 605 F.3d at 749.

6                          iii.      The Context of Plaintiff's Speech

7            Finally, courts "examine the context of the speech, particularly the *point* of the speech."

8   *Desrochers*, 572 F.3d at 715 (citation omitted). "In other words, why did the employee speak (as

9   best as we can tell)? Does the speech 'seek to bring to light actual or potential wrongdoing or

10  breach of public trust,' or is it animated instead by 'dissatisfaction' with one's employment

11  situation?" *Id.* (quoting *Connick*, 461 U.S. at 148). Thus, while "[p]ublic speech is more likely to

12  serve the public values of the First Amendment," and public employees who "are positioned

13  uniquely to contribute to the debate on matters of public concern" should be encouraged "to speak

14  out about what they think and know without fear of retribution[] so that citizens may be informed

15  about the instruments of self-governance," *Gilbrook v. City of Westminster*, 177 F.3d 839, 870

16  (9th Cir. 1999), "[p]rivate speech motivated by an office grievance is less likely to convey the

17  information that is a prerequisite for an informed electorate," *Weeks v. Bayer*, 246 F.3d 1231,

18  1235 (9th Cir. 2001). On its face, plaintiff's tort claim appears essentially self-interested, because

19  it contains demands for monetary damages and for injunctive relief instating him to the rank of

20  lieutenant. (*See* Doc. No. 11-2 at 117, 124–25.) Such "self-interested" speech typically has "no

21  public import." *Roe*, 109 F.3d at 585. However, plaintiff's tort claim also appears to be an

22  "extension" of "[t]he ultimate source of the grievances" in this case: the discrimination and

23  retaliation that plaintiff allegedly suffered for being Hispanic and for raising concerns about

24  FPD's corporal program. *Cf. Desrochers*, 572 F.3d at 716 (emphasizing that the speech at issue

25  in the case was a "mere[] extension" of "[t]he ultimate source of the grievances" between the

26  plaintiffs and their supervisor, which could be traced "to the simple fact that [they] did not get

27  along"). That plaintiff seeks to remedy adverse employment actions taken against him does not

28  /////

obviate the fact that his claim ultimately arises from his attempt to shed light on matters of public concern.

After evaluating "the content, form, and context" of plaintiff's speech as "revealed by the whole record," *Connick*, 461 U.S. at 147–48, the court finds as a matter of law that plaintiff's tort claim involves a matter of public concern.  Accordingly, defendants' motion to dismiss will be denied as to this claim.

> 2.   Plaintiff's Claim under California Labor Code § 6310

California Labor Code § 6310 prohibits an employer from terminating or discriminating against an employee who has reported health and safety violations.  *See also Freund v. Nycomed Amersham*, 347 F.3d 752, 759 (9th Cir. 2003) ("The public policy behind § 6310 is . . . to prevent retaliation against those who in good faith report working conditions they believe to be unsafe."). Defendants argues that this claim should be dismissed because (1) "allegations relating to complaints for the public benefit are not protected under Section 6310" and (2) plaintiff's complaint about the corporal program "does not relate to any safety device or weapon" and (3) is preempted by the MOU.  (Doc. No. 11-1 at 22–23.)

Defendants' first argument that complaints for the benefit of the public are not cognizable under § 6310 is unavailing.  Although plaintiff did raise concerns about how the corporal program could "create[] safety concerns for the public," he *also* complained that it could "result[] in a safety hazard for officers."  (Compl. at ¶¶ 15, 17.)  Plaintiff further alleges in his complaint that he spoke out "to protect the safety of his fellow officers" and to "express[] concerns regarding unsafe working conditions."  (*Id.* at ¶¶ 17, 21, 24.)  Accordingly, plaintiff's expressed concerns about the safety of his fellow officers and his own working conditions fall squarely within the ambit of § 6310's protections.

Defendants' second argument is similarly misplaced.  As plaintiff points out, defendants rely on language from § 6403 to argue that claims brought under § 6310 must be based on the actual physical conditions of an employee's workplace.  (*See* Doc. Nos. 11-1 at 22; 12 at 24–25.) But the language of § 6310 contains no such limitations; rather, it explicitly prohibits retaliation against employees who have complained of "unsafe working conditions, or work practices, in his

19

1    or her employment or place of employment."  Cal. Lab. Code § 6310(b).  Courts have repeatedly

2    interpreted § 6310 according to its plain meaning, which incorporates a wide swath of working

3    conditions—physical or otherwise.  *See, e.g.*, *Sheridan v. Touchstone Television Prods., LLC*, 241

4    Cal. App. 4th 508, 511 (2015) (complaint about an abusive showrunner); *Franklin v. The*

5    *Monadnock Co.*, 151 Cal. App. 4th 252, 263 (2007) (complaint about a violent coworker);

6    *Cabesuela v. Browning-Ferris Indus. of Cal., Inc.*, 68 Cal. App. 4th 101, 109 (1998) (complaint

7    about being forced to work long hours); *Gringeri v. Lynch*, No. 5:08-cv-03453-JW, 2009 WL

8    10710476, at *4 (N.D. Cal. Nov. 17, 2009) (complaint about an erratic and unstable coworker).

9    Accordingly, the court finds that plaintiff's complaint about potentially unsafe working

10   conditions caused by the haphazard promotion of undertrained officers into supervisory roles can

11   serve as the basis of a cognizable § 6310 claim.

12        Finally, defendants' third argument as to preemption also fails.  According to defendants,

13   any disputes as to the corporal program is preempted by the MOU's grievance procedure, which

14   consists of an "informal" and "formal" process that can lead to arbitration.  (*See* Doc. Nos. 11-1

15   at 22–23; 11-2 at 79–83.)  But defendants misconstrue plaintiff's claims, which are not about the

16   corporal program itself, but about the retaliation allegedly inflicted on plaintiff for speaking out

17   about that program.  (Doc. No. 12 at 26.)  Thus, defendants' argument in this regard simply

18   misses the mark.

19        Accordingly, defendants' motion to dismiss will be denied as to plaintiff's § 6310 claim.

20   **C.**    **Motion for a More Definite Statement**

21        In the alternative, defendants move for a more definite statement under Federal Rule of

22   Civil Procedure 12(e).  The granting of such a motion is only appropriate when a pleading is "so

23   vague or ambiguous that the [responding] party cannot reasonably prepare a response."  Fed. R.

24   Civ. P. 12(e).  Thus, "such motions are disfavored . . . and 'should not be granted unless the

25   defendant cannot frame a responsive pleading.'"  *Mou v. SSC San Jose Operating Co. LP*, 415 F.

26   Supp. 3d 918, 924 (N.D. Cal. 2019) (quoting *Famolare, Inc. v. Edison Bros. Stores, Inc.*, 525 F.

27   Supp. 940, 949 (E.D. Cal. 1981)).  Ironically, defendants dedicate all of one sentence to their

28   motion for a more definite statement and fail to "point out the defects complained of and the

1   details desired," as required by Rule 12(e).  (Doc. No. 11 at 23.)  Defendants' motion for a more

2   definite statement is thus facially defective and, accordingly, will be denied.

3   **D.      Motion to Strike**

4          Defendants also move to strike plaintiff's claims against defendants Dyer and Hall in their

5   official capacities because "[c]ivil [r]ights claims against government officials in their official

6   capacities are really suits against the government employer because the employer must pay any

7   damages awarded."  (Doc. No. 11 at 24.)  Plaintiff filed suit against defendants Dyer and Hall

8   both individually and in their official capacities as the former and current Chief of the FPD,

9   respectively.  However, plaintiff has now indicated his non-opposition to the motion to strike the

10   official capacity claims.  (Doc. No. 12 at 28.)  Accordingly, plaintiff's claims against defendants

11   Dyer and Hall in their official capacities will be stricken.

12                                     **CONCLUSION**

13        Accordingly:

14        1.      Defendants' motion to dismiss (Doc. No. 11) is granted in part;

15                a.      To the extent that plaintiff's § 1983 claim is based on complaints that he

16                        made to his supervisors at the FPD, his claim is dismissed as legally not

17                        cognizable;

18                b.      Defendants' motion to dismiss is denied as to all other claims;

19        2.      Defendants' motion for a more definite statement (Doc. No. 11) is denied; and

20        3.      Defendants' motion to strike (Doc. No. 11) is granted as unopposed and plaintiff's

21                official capacity claims against defendants Dyer and Hall are stricken.

22   IT IS SO ORDERED.

23     Dated:   __**August 15, 2020**__            _____

24                                                UNITED STATES DISTRICT JUDGE

25

26

27

28

                                              21